## THE CITY OF PORTSMOUTH.

### (District Court, E. D. Virginia. July 28, 1903.)

**1. SHIPPING—INJURY OF PASSENGER—NEGLIGENT FASTENING OF VESSEL TO DOCK.**

A steam ferryboat which, while discharging passengers on a dock or float, by reason of being insufficiently secured swung away from the float, leaving a space of several inches, is liable for an injury to a passenger, who in attempting to pass from the vessel, and in the exercise of due care, stepped into such space, or was thrown by the lurching of the vessel, and fell between the vessel and dock.

**2. DAMAGES—PERSONAL INJURY—AMOUNT OF AWARD.**

An award of $4,000 damages made to a woman passenger, who fell while passing from a steam ferryboat and sustained a severe sprain of her ankle, and also a fracture of the coccyx, which latter injury, as shown by the medical testimony, was permanent in character, and such as would seriously affect the nervous system of a weak, delicate woman, and tend to make her an invalid and nervous wreck, was reasonable.

In Admiralty. Suit for personal injuries to passenger.

Miller & Coleman, for libelant.

T. J. Wool and McLemore & Corbitt, for respondent.

WADDILL, District Judge. The libelant in this case seeks to recover damages for personal injuries sustained by her, while traveling as a passenger on the ferry steamer City of Portsmouth, plying between the cities of Norfolk and Portsmouth, by falling between the steamer and the float while leaving the steamer at its berth in the city of Portsmouth. The libelant's case, briefly, is that on the night of the 10th of June, 1902, on leaving the steamer in the usual manner, after it was supposed to have been made fast, she (the libelant), exercising due care, and as other passengers were leaving, "by reason of carelessness and negligence in mooring said steamer to said float or dock, a large opening between the said steamer and the said dock was caused by the said steamer backing from the side of the dock for a distance sufficient to allow her to miss her footing, and to fall between said steamer and said dock, where she hung until dragged from her perilous position; and by reason of her fall between said steamship and said dock she was permanently injured about her back, body, limbs, and internally." The respondent, the owner of the steamer, denies all negligence on their part as to the mooring of said steamer, or that there was any opening between the steamer and the dock; and insist that the libelant received no permanent injury to her back, body, limbs, or internally, and that, if she did, it was due to the negligence and carelessness of the libelant, and on account of no fault of respondent.

The case turns almost entirely upon a correct determination of the facts, since, whatever may be the true criterion of duty due by the respondent to the libelant, it cannot be doubted, if the condition of the passageway provided for the exit of passengers from the steamer was as claimed by libelant, that the respondent failed in its duty to exercise proper care for her on the occasion in question. The accident was an unusual one, as well in the manner in which it happened as in the ex-

tent of the injury sustained by the libelant. That the libelant did fall, and as a result received serious injury, cannot be questioned. To maintain the facts contended for by her, four eyewitnesses to the occurrence were examined, three of whom were in no manner interested, strangers to the libelant, who happened to be traveling on the steamer, saw her fall, and pulled her up from between the float and steamer; and two of them aided in taking her home, a short distance away. These witnesses appear to be entirely respectable and intelligent, and by their manner of testifying and their general demeanor would carry conviction to the mind of any impartial person as to the truthfulness of their several statements. They, in effect, say, that the libelant was leaving the steamer, the same having been apparently made fast, and passengers invited to leave, quite a number of pasengers having passed off before her; that they observed libelant suddenly fall, and sprang to her assistance, raised her up, and helped her off the boat, one or more of them standing at the time with one foot on the steamer, and the other on the float; and they describe the opening as sufficiently wide to allow the libelant's limb to pass through as claimed by her. One of them also testified that while the libelant was being pulled out of the space between the boat and float, he saw the man at the wheel pulling on the wheel, pulling the boat up to the float, and that there was then an opening 8 or 10 inches wide. The libelant further testified that as she was stepping from the steamer there was a sudden lurch of the boat from the dock, which threw her violently back, her limb slipping between the steamer and the float, striking her back against the boat, by which her body was greatly bruised and her ankle sprained; that she did not, for the moment, suppose that she was seriously hurt, though she felt faint when putting her foot to the floor; and, although it was suggested that she get a carriage, she insisted on walking to her home, and was assisted there; and that, though suffering great pain, she did not realize for several days that she was seriously hurt. She is sustained in her statement as to the steamer's lurching by at least one witness. The respondent did not know of the accident at the time, and, indeed, heard nothing of it until its officers saw an account of it in the papers on the next day. Hence, although quite a number of witnesses were examined for respondent, including the master of the steamer and two deckhands on duty at the time, the latter witnesses only testified generally as to the landing of the boat, as they did not see or know of the occurrence at the time and until they saw it in the papers the following evening. Two witnesses were examined by the respondent, both of whom testified to the fall of Mrs. Carr, and described the manner in which she fell differently from the libelant's witnesses, and indicated that she stumbled and fell, as distinguished from falling between the float and the boat; and the evidence of the master of the steamer tends to establish that the float did not come down to the level of the deck of the steamer, so as to form an even surface, but that the float was several inches higher than the steamer. Whatever may be the precise manner in which the libelant fell, certain it is that the space between the float and the steamer should not have been left in such condition as that a passenger stepping from one to the other could

fall between the two, and the float itself should not have been left in such condition that passengers would fall over it on leaving the steamer. The evidence of respondent's witnesses, including the master of the steamer, is not inconsistent with the fact of the lurching of the steamer, as claimed by the libelant; as the master explains in his evidence that, after the gates had been opened for passengers to leave the steamer, the deckhand went to his wheel, and stayed there, trying to heave in the steamer, and it looked to him as if he could not get it in; and, further, that he (the master) was working the steamer ahead until about 150 passengers had gotten off. From the whole case, therefore, the court is satisfied, from the overwhelming preponderance of the evidence, that there was, either from the lurching of the steamer, or the failure properly to moor the same, a space between the steamer and the float, sufficient for the libelant to step between the two, and in which she did step, while passing from the steamer, and sustained the injuries sued for.

The character of the injury sustained by the libelant is unusual, as before stated. It was at first supposed she had only sprained her ankle, and probably wrenched her back; but it subsequently developed that the sprain of the ankle was of a serious character, necessitating a plaster cast, and that the injury to her back, aside from the bruises and wrench, consisted of a fracture of the coccyx—the coccyx being described by one physician as the rudimentary tip of the spinal column, and a fracture of which, another of the physicians states, generally makes an invalid for life, and that it usually sets up a painful condition that lasts for years, making a nervous wreck of the party afflicted, and tends, in case of a female, to incapacitate her for future child-bearing; and that the treatment of such an injury was difficult, and could only be entirely relieved by an operation, which was serious in its character. The evidence further tended to show that the libelant was a nervous, delicate woman, predisposed to fainting attacks, and therefore one susceptible to an injury of this nature; that the injuries were of a kind that would affect her nervous system, were not easily discernible, and could not be noticed on some occasions without actual examination. Indeed, two highly reputable physicians introduced by libelant testified that they could not have judged of the injuries at all without seeing for themselves, and one of them testified that at first, by reason of the appearance of the libelant, before he had made an examination, he wondered if the case might not be one of blackmail; but that her true condition by examination was, and could easily be, ascertained by a skilled physician.

The character and extent of the injury was the more beclouded by the fact that libelant's regular attending physician immediately after the accident had the misfortune, some six weeks after the occurrence, to be assassinated by a crazy patient, which deprived us of his evidence. It sufficiently appeared that, within a few days after the libelant had fallen, the sprained ankle was placed in a plaster of paris cast, and that for some six weeks thereafter she was confined to bed, suffering great pain; and some two days before the death of the doctor he removed the cast, after which time another physician was called in, who testified as to her condition from thence on, as did members

of the family and friends, all of whom described the libelant as a great sufferer at times, though on other occasions she was apparently well and free from pain. It is clearly evident that the injuries to the libelant were painful and serious in character, and for which she is entitled to recover in this case.

The respondent at the trial introduced two witnesses—one who testified that the libelant at the time she received the injury was under the influence of liquor; and the other that the injury from which she suffered was not caused by the accident on the steamer, but by reason of a fall upon a chair in her home on the Sunday after the accident. In reference to each of these defenses it may be said that they were sufficiently important, if true, to have justified the respondent in setting them up in its pleadings; and, because of the failure to do so, the court can but view them in the light rather of an afterthought than otherwise, and it should not readily be assumed that such important omissions would have been made in the pleadings if there had been any real evidence to support them. Thomas v. Winne (C. C. A.) 122 Fed. 396, 397. There is no evidence to support the suggestion of drunkenness, and there is nothing to give color to the charge further than that the libelant, on the night of the accident, while taking supper at a restaurant in the city of Norfolk, did take one, and possibly two, glasses of intoxicants; the testimony being in conflict whether there was one or two, and as to the character of what was drank. The imprudence of this act on the part of the libelant may be conceded, and it is to be regretted that in modern life the custom has become too prevalent for reputable females to drink spirituous liquors in public places. Such conduct is always likely to be the subject of unfavorable criticism, and the present case is a striking illustration of the unfortunate consequences likely to flow therefrom. But the idea of drunkenness on this occasion is entirely dispelled. The evidence of those present at the restaurant, as well as persons who saw the libelant on the steamer, aided her when she fell, and assisted her home, all show the utter lack of foundation for this claim. Indeed, the respondent's witnesses so entirely vindicate her from this charge, that the fact of making the same tends rather to show that the purpose was to otherwise reflect upon the libelant, rather than to maintain the defense of drunkenness.

So far as the injury by the fall on the chair is concerned, it is sufficient to say that the evidence likewise fails to support this contention. While it is true the physician for the respondent saw the libelant on several occasions at and about the time of the accident, and under more or less embarrassing circumstances, as he admits, says that the libelant on the Sunday night after the accident, when he called to see her on account of an attack of hysteria, told him that she had fallen in a paroxysm of pain, and hit her back on a chair, and hurt her spine, this the libelant positively denies, and explains that when he came she was under the influence of morphine, and fainting with pain; that she informed him she was suffering terribly with her back, in exactly the place she was struck on the ferry; and that, instead of saying what the doctor said, she said she was trying to pull a chair to sit down—her limb then being in the plaster of paris cast—when

she hurt herself again. If the statement, as testified to by the respondent's physician, that she had fallen and struck her back on a chair and hurt her spine, were true, it by no means follows that she then sustained the severe injury to her coccyx, or that she had not previously sustained the same; on the contrary, it is quite consistent that the original injury had occurred, and hence the serious effect of the slight fall or jar from the chair. It is also apparent from the physician's evidence that he had not, previous to the latter fall, made any examination that would tend to throw light upon this particular injury, and that it was not until the Tuesday following the fall from the chair that he made such examination, and as to the making of which, taking into account the peculiarly delicate character of the examination, and what had occurred in reference to the doctor's previous connection with the case, and what took place at the time as to whether or not he should make the examination, it cannot be said that the doctor is free from just criticism in making the examination at all under the circumstances. Aside from the improbability of the libelant sustaining the injury to her coccyx by a fall on the chair, the fact that this defense is based upon the alleged statement of the libelant, made when seriously suffering as the result of the injury sued for, should not lead the court quickly to adopt that theory, which appears not to have been of sufficient importance to be set up in pleadings (Inland & Sea-Board Coasting Co. v. Tolson, 139 U. S. 551, 553, 554, 11 Sup. Ct. 653, 35 L. Ed. 270); particularly as the doctor is most positively contradicted both by the libelant and her husband—the latter of whom heard what occurred between them—as to some of the important features of the case.

The character of the injury has been quite fully considered, and it only remains to determine what damages should be allowed to the libelant. This is a difficult question, one largely in the discretion of the court, and of peculiar delicacy in this case. Injuries affecting the nervous system are more or less serious, and their extent difficult of ascertainment. They are liable to be of uncertain duration and intensity; and, in short, it is impossible to see and foretell just what will be the result in such cases. With a woman of nervous temperament, and with injuries of the character sustained in this case, it may be treated as reasonably certain that she will not quickly recover from them. Medical experts testified that the injuries sustained are all permanent in character, and from which the libelant will suffer all of her life, and tend to make her an invalid and a nervous wreck. An award, therefore, of $4,000, is thought only to be reasonable, and the same will be allowed accordingly.